### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MOXIE APPAREL, INC., | Case No. |
| *Plaintiff,* | **JURY TRIAL DEMANDED** |
| v. | |
| SIDHARTH LAKHANI | |
| *Defendant.* | |

### <u>COMPLAINT</u>

Plaintiff Moxie Apparel, Inc. ("Moxie") brings this Complaint against Defendant Sidharth Lakhani ("Lakhani" or "Defendant") and complains and alleges as follows:

### INTRODUCTION

1.      Moxie is a medical apparel company that sells scrubs for medical professionals, including through its direct-to-consumer e-commerce platform.

2.      Moxie's business depends on its access to inventory, the sale of which is Moxie's primary source of revenue. To ensure it had access to inventory, Moxie negotiated two agreements with Defendant Lakhani. Under one, Lakhani's then-company Krazy Kat Sportswear, LLC ("Krazy Kat") would design and manufacture 100% of Moxie's inventory requirements for a period of at least two years and provide that inventory to Moxie on net-90-day payment terms. Under the other, Lakhani invested in Moxie, became a Moxie board member, and received various rights that gave him significant control over the company.

3.      Several months after Moxie entered into the inventory supply agreement with Krazy Kat, Lakhani sold Krazy Kat to Careismatic Brands, LLC ("Careismatic"). Careismatic was

1

the world's largest manufacturer of medical apparel and a major Moxie competitor. As a result of the sale, Lakhani became a Careismatic employee and one of its largest individual shareholders. This was a significant conflict of interest, as Lakhani was simultaneously (a) a director of Moxie with significant control over the company and (b) an employee of Moxie's largest competitor with a significant financial interest in the success of that entity.

4.    Lakhani thereafter took steps to impede Moxie's ability to compete with Careismatic, including by cutting off its access to inventory, drying up its access to funding, and attempting to acquire Moxie in a distressed state at a discount.

5.    Lakhani's actions caused Moxie significant damages, including millions of dollars in lost profits and a significant diminution in the overall value of Moxie's business.

6.    Through this complaint, Moxie asserts claims for breach of fiduciary duty, violation of Massachusetts General Law Chapter 93A, tortious interference with advantageous business relations, and tortious interreference with contract.

## PARTIES

7.    Plaintiff Moxie Apparel, Inc. is a Delaware corporation headquartered in Boston, Massachusetts.

8.    Defendant Sidharth Lakhani is a natural person and a resident and citizen of California.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Moxie and Lakhani are citizens of different states and the amount in controversy is greater than $75,000.

10.    This Court has personal jurisdiction over Lakhani because he (a) invested in, was a director of, and exercised control over Moxie, which is headquartered in Massachusetts, (b)

interfered with Moxie's business, which was located in Massachusetts, (c) knew that his actions would harm Moxie in Massachusetts, and (d) as intended, did cause harm to Moxie in Massachusetts.

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Moxie's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  Moxie Apparel, Inc.

12.    Moxie is a medical apparel company that sells scrubs to medical professionals, including through its direct-to-consumer e-commerce platform.

13.    Born out of Harvard's Innovation Lab, Moxie was founded in 2019 by its Chief Executive Officer, Alicia Tulsee.

14.    Moxie was one of the first direct-to-consumer brands for nurses, and one of the first lifestyle consumer goods brands for nurses.

15.    Moxie had a marketing agreement with the American Nurses Association (the "ANA"). The ANA endorsed Moxie as the new, go-to scrubs brand for nurses, and marketed Moxie's brand in communications with its members. The ANA endorsement is coveted in the medical apparel industry and made Moxie a potential acquisition target for its more-established competitors.

### B.  Moxie Enters Into Agreements With Lakhani And His Then-Company Krazy Kat

16.     After its formation in 2019, Moxie sought to secure a supply of scrubs that it could market and sell to consumers.

17.    Krazy Kat manufactured and sold scrubs, including under the "Healing Hands" brand.

3

18.     Lakhani is the former owner and Chief Executive Officer of Krazy Kat.

19.     Lakhani was interested in investing in Moxie, and, because of his control over Krazy Kat, had the ability to design and manufacture scrubs for Moxie.

20.     In late 2019, Lakhani and Moxie negotiated a dual investment and supply structure under which Lakhani would: (a) invest $300,000 in Moxie pursuant to the terms of certain convertible note agreements; and (b) support and finance Moxie's product development for a period of at least two years under the terms of a manufacturing and supply agreement between Moxie and Krazy Kat.

21.     During these negotiations: (a) Krazy Kat offered Moxie preferential terms under the manufacturing and supply agreement to ensure Moxie's access to inventory (*e.g.*, Krazy Kat would design, manufacture and supply all of Moxie's inventory requirements for a period of at least two years, and finance Moxie's ability to pay for that inventory by delivering it on net-90-day payment terms); and (b) Moxie made material concessions to Lakhani under the terms of the note agreements (*e.g.*, that Lakhani would have a seat on Moxie's board of directors, consent rights over material business decisions, and non-dilutive equity conversion rights). In that way, Moxie bargained for favorable terms under the manufacturing and supply agreement with Krazy Kat in exchange for Lakhani receiving favorable terms under the note agreements.

22.     The parties finalized and entered into the agreements in August 2020.

    a.     *Note Agreements Between Lakhani & Moxie*. Lakhani agreed to invest $300,000 in Moxie under the terms of certain note agreements (the "Note Agreements"). Under the terms of the Note Agreements, Lakhani obtained: (a) a seat on Moxie's board of directors; (b) the right to approve material business decisions; and (c) anti-dilution protection, which prevented Moxie from raising additional capital without Lakhani's consent to dilute his position.

b.    *Manufacturing & Supply Agreement Between Krazy Kat & Moxie*. Under the terms of the Manufacturing and Supply Agreement (the "MSA"), Moxie agreed that Krazy Kat would be its exclusive manufacturer, and Krazy Kat agreed to, among other things: (a) design and manufacture 100% of Moxie's inventory requirements through at least August 2022 (and month-to-month thereafter until either party terminated the agreement); and (b) provide the inventory to Moxie on net 90-day payment terms. The 90-day financing was critical to the agreement because Moxie had limited capital to pre-pay for inventory and thus its business depended on its ability to acquire the inventory on net-90-day terms and sell the inventory during that period to pay off the invoice. With respect to amendments, the MSA stated that: "[n]o amendment, modification, or waiver of any provision hereof shall be binding unless manually executed in a writing identified as an amendment, by both Parties, or in the case of a waiver, by the Party granting the waiver."

### C.  Careismatic Acquires Krazy Kat & Lakhani Develops A Conflict Of Interest

23.    Careismatic is the world's largest manufacturer of medical apparel and a major Moxie competitor.

24.    In late 2020, several months after Moxie entered into the MSA with Krazy Kat, Careismatic acquired Krazy Kat from Lakhani.

25.    In connection with that transaction Lakhani became a Careismatic employee and, upon information and belief, one of Careismatic's largest individual shareholders.

26.    As a result of the sale, Lakhani developed a significant conflict of interest, as Lakhani simultaneously (a) was a director of Moxie with control over the company and (b) was an employee of Moxie's largest competitor with a significant financial interest in the success of that entity.

27.    Although Careismatic had dominated the U.S. medical apparel market for years, it

was traditionally a wholesale business that sold its products through third-party retailers (e.g., Wal-Mart), and internally recognized that emerging competitors with direct-to-consumer models presented a significant threat to its business.

28.     Careismatic wanted to acquire or launch a direct-to-consumer brand to help it compete in the market.

**D.  Lakhani Interferes With Moxie's Business**

29.     After finalizing the MSA with Krazy Kat, Moxie requested that Krazy Kat manufacture and deliver a small, initial run of product so that Moxie could test market fit prior to placing a larger order.

30.     Although Krazy Kat was obligated to produce this order under the terms of the MSA, Lakhani intervened and demanded that Moxie instead take an unusually large initial order of inventory totaling approximately $800,000 in MSRP. As a new company without an established sales record, Moxie was concerned with its ability to move that quantity of inventory within the net-90-day payment window. But Lakhani insisted, and—because (a) Moxie needed inventory to launch its business and begin to generate revenue, (b) Krazy Kat was contractually entitled to be Moxie's exclusive supplier, and (c) Lakhani had significant control over Moxie's future business prospects under the terms of the Note Agreements—Moxie moved forward under Lakhani's demand. Upon information and belief, Lakhani insisted on this large, initial order precisely because Moxie would struggle to sell it during the 90-day payment window and likely be late to pay the invoice, thus giving Lakhani a pretext to interfere with Krazy Kat's going-forward obligations under the MSA (while, at the same time, keeping his control over Moxie under the separate Note Agreements).

31.     Krazy Kat delivered the large, initial order to Moxie in March 2021. Per the terms

of the MSA, Moxie's payment for the March 2021 delivery was due in June 2021.

32.    As predicted, Moxie struggled to move the large quantity of inventory during the 90-day payment period. Moxie paid half the initial invoice on time, worked out a schedule with Krazy Kat under which it would make weekly installment payments toward the balance, and was approximately two months late paying the invoice in its entirety.

33.    Pursuant to his rights under the Note Agreements, Lakhani acted as director of Moxie and attended board meetings in that capacity. In late October 2021, Lakhani attended an in-person Moxie board meeting with Tulsee and other Moxie officers. At that meeting, Lakhani informed Tulsee that, in light of Moxie's late payment of the initial invoice under the MSA, Lakhani would direct Krazy Kat to no longer honor the net-90-day payment terms contained in the MSA and instead require Moxie to pre-pay 50% of any future invoice at the time the order was placed. This was a material change because, as noted above: (a) Moxie's business depended on its ability to acquire the inventory on net-90-day terms and sell the inventory during that period to pay off the invoice; and (b) Moxie had given Lakhani significant rights under the Note Agreements in exchange for the net-90 term in the MSA.

34.    Per the MSA, Krazy Kat did not have the ability to unilaterally change the net-90-day payment terms, as: (a) the MSA stated that "[n]o amendment, modification, or waiver of any provision hereof shall be binding unless manually executed in a writing identified as an amendment, by both Parties, or in the case of a waiver, by the Party granting the waiver"; and (b) the parties never executed an amendment. Moxie contested Lakhani's ability to change the terms of the MSA, but Lakhani insisted.

35.    This put Moxie in a bind. Krazy Kat was contractually entitled to be Moxie's exclusive supplier, and Moxie needed inventory to generate revenue. Additionally, Moxie had

given Lakhani significant control over Moxie under the terms of the Note Agreements and did not want Lakhani to exercise that control to Moxie's detriment, including by blocking Moxie's ability to raise future funding from other outside investors. Thus, Moxie attempted to move forward under Lakhani's demand.

36.     The change in payment terms caused a multi-month delay in Moxie's ability to place a second order. Between October 2021 and March 2022, Moxie raised additional capital so that it could make a $300,000 (*i.e.* 50%) deposit on a new order, which Moxie placed in March 2022.

37.     At that time, Careismatic was involved in litigation against another emerging direct-to-consumer brand called FIGS, Inc. Like Moxie, FIGS was a medical apparel and lifestyle brand that marketed and sold its products directly to consumers through its e-commerce platform. Careismatic documents produced in the case revealed, among other things, that:

      a.     Careismatic viewed emerging direct-to-consumer brands as having a competitive advantage over Careismatic's legacy wholesale model and a "growing ability to disrupt [Careismatic's] business" that "must be taken seriously";

      b.     Careismatic attempted to enlist its retail partners in a "battle" against emerging direct-to-consumer companies, in which Careismatic and its retail partners would "work together to make it harder" for direct-to-consumer companies to compete;

      c.     Careismatic's then-CEO, Mike Singer, wanted Careismatic to: (i) "attack" direct-to-consumer competitors; (ii) limit those companies' future success by "pressur[ing]" their "bottom lines," "driv[ing] up their costs," and "dry[ing] up their funding"; and (iii) acquire or launch a direct-to-consumer brand to help Careismatic compete;

      d.     Careismatic's then-CEO, Mike Singer, asked his team to target and "attack"

FIGS, after which Careismatic filed a lawsuit against FIGS alleging that FIGS falsely advertised its products.

38.    Lakhani and Careismatic's then-CEO, Mike Singer, contacted Moxie and expressed interest in acquiring Moxie. Moxie believed Careismatic was interested in the acquisition because Moxie was an emerging direct-to-consumer business and had the coveted ANA endorsement, and thus presented as a significant opportunity for Careismatic to expand into the direct-to-consumer market. Moxie told Singer it was not interested in being acquired.

39.    After Moxie made the 50% deposit on its new order, Lakhani surprised Moxie again by stating that, in addition to the 50% deposit, Moxie would be required to pay the remaining 50% balance in full before Krazy Kat would deliver the goods. Moxie knew that, absent access to the inventory, it would not have the ability to generate an additional $300,000 in revenue to pay the balance of the invoice prior to delivery. Tulsee contacted Lakhani, explained the impossibility of the situation, and told him that if he was going to block Krazy Kat from performing under the net-90-day terms in the MSA, then the terms of the Note Agreements (including Lakhani's control over Moxie and significant equity conversion rights) would need to be revisited because they were only agreed to for the terms of the MSA. Lakhani refused to revisit his rights under the Note Agreements and told Tulsee he would "let the lawyers handle it," which Moxie understood as a litigation threat.

40.    Tulsee told Lakhani that: "[a]s the only other [Moxie] board member, I need you to advocate for Moxie Scrubs and not hurt the company's growth." Lakhani responded: "I have a conflict of interest being a board member of Moxie and also an employee of [Careismatic]," and that he intended to "do the right thing for the main business" (*i.e.*, Careismatic), rather than Moxie.

41.    When Moxie attempted to push back on Lakhani, Lakhani threatened to call

Moxie's obligations under the Note Agreements—likely sending Moxie into bankruptcy—unless Moxie agreed to his various demands.

42.    In June 2022, Lakhani was promoted to Chief Operating Officer of Careismatic.

43.    Moxie's inability to access inventory under the terms of the MSA prevented Moxie from selling its products to generate revenue, significantly reduced Moxie's access to working capital, and pressured Moxie's bottom line.

44.    In approximately August 2022, Lakhani told Tulsee that, in light of Moxie's condition, he could acquire Moxie for "cheap," and, further, that a cheap acquisition of Moxie would look good to Careismatic in his role as Chief Operating Officer. Moxie understood this as a threat that Lakhani could continue blocking Moxie's access to inventory and/or call Moxie's obligations under the Note Agreements, creating a liquidity crisis that could drive Moxie into bankruptcy, at which point Lakhani would be well-positioned to acquire Moxie given his position under the Note Agreements.

45.    In October 2022, Moxie's new order arrived at Krazy Kat's warehouse. As predicted, Moxie did not have the capital to pay off the entire $300,000 balance prior to delivery, and thus asked Krazy Kat to break the order into three tranches that could be purchased individually. Citing the new payment terms imposed by Lakhani, Krazy Kat personnel refused to break the shipment into tranches and demanded that Moxie pay the entire outstanding balance prior to delivery. Tulsee told Krazy Kat personnel: "That's not what our contract says. Our contract says we do not have to pay for the goods until 90 days after it lands. … Given this departure from our agreement I'm sure you can accommodate us taking what we can pay for upfront to find the middle ground for your requests under your new management." Krazy Kat responded: "[we] are following what we were told after the conclusion of those meetings [with Lakhani]." Tulsee responded: "[N]o

new agreement was ever signed. I agreed verbally to pay [the 50%] upfront price because as our exclusive supplier we have no choice but to place the order with you for the inventory. … I am dependent on you with inventory … Unfortunately we don't align on the departure from the original agreement." Acting on the directive from Lakhani, Krazy Kat refused to split the inventory into tranches that Moxie could afford to purchase, and instead held Moxie's inventory hostage at its warehouse.

46.    The change in payment terms (which caused a multi-month delay in Moxie's ability to even place the second order), and subsequent refusal to release the inventory that had arrived, resulted in Moxie having little inventory to sell on its e-commerce platform, no ability to accept purchase orders from third-party retail partners, little ability to generate revenue, and limited working capital to run the company's operations.

47.    From Moxie's perspective, the problem was intractable. Krazy Kat would not release Moxie's inventory without money Moxie didn't have. Moxie couldn't make the money to purchase the inventory from Krazy Kat because it did not have products to sell. And Moxie could not raise the money to pay for the goods through additional outside investment because: (a) the poor sales and revenue data caused by the lack of inventory made investors leery of making an investment in Moxie, and (b) in any event, Lakhani had the ability under the Note Agreements to block additional outside investment.

48.    The lack of inventory killed Moxie's e-commerce business. When Moxie had inventory to sell (*i.e.*, after it received the initial, large order from Krazy Kat), it realized an average or above-average conversion rate on its e-commerce platform, meaning that, when inventory was in-stock and available on Moxie's website, the percentage of visitors to the website who went on to make a purchase was average or above-average for the medical apparel industry. When

inventory was later out-of-stock and unavailable on Moxie's website (*i.e.*, after Lakhani directed Krazy Kat to refuse to provide Moxie inventory under the terms of the MSA), the percentage of visitors who went on to make a purchase plummeted.

49.    The lack of inventory also killed Moxie's ability to close deals with third-party retail partners. For example:

a.    Moxie negotiated with third party Scrubs & Beyond to place Moxie's products in Scrubs & Beyond's retail stores. Scrubs & Beyond operates over 100 stores in 30 states nationwide. Scrubs & Beyond agreed to carry Moxie product and sent Moxie a $250,000 initial purchase order, but Moxie was unable to fill it because of the inventory shortage caused by Lakhani's conduct. Moxie requested that Scrubs & Beyond pre-pay for the goods in full (so that Moxie could then send those funds to Krazy Kat to obtain access to its inventory) but Scrubs & Beyond declined to do so. Thus, the deal fell through.

b.    Moxie negotiated with third party Scrubs on Wheels to place Moxie's products in Scrubs on Wheel's mobile retail storefronts. Scrubs on Wheels sells medical apparel out of vehicles in front of medical facilities, so that medical providers can purchase the scrubs they need at their place of business, rather than having to order them online or go to a brick-and-mortar store. Scrubs on Wheels was willing to commit 25% of its revenue to Moxie products and purchase approximately $5,000,000 in Moxie inventory per year. Scrubs on Wheels sent Moxie a purchase order for an initial test run, but Moxie was unable to fill it because of the inventory shortage caused by Lakhani's conduct. Thus, the deal fell through.

50.    The lack of inventory also killed Moxie's coveted endorsement from the American Nurses Association. Because of the lack of inventory, Moxie was unable to deliver the products requested by ANA members, which strained the ANA relationship. And because of the lack of

revenue caused by the lack of inventory, Moxie was unable to continue paying the ANA under the terms of the parties' marketing agreements. As a result, the ANA stopped endorsing Moxie as the go-to scrubs brand for its members.

51.    In June 2023, Moxie received a last-minute opportunity to feature its products on the Good Morning America ("GMA") television show. GMA represented an opportunity to significantly increase sales and brand awareness. When negotiating the agreement related to that appearance, GMA told Moxie that it intended to feature Moxie's founder, Alicia Tulsee, on future episodes of GMA and/or its sister shows. Moxie and GMA entered into an agreement, under which GMA would feature and sell Moxie's products on an upcoming episode. The agreement required Moxie to ship the products sold on GMA within three days of the customer orders. Moxie explained the situation to Lakhani and asked him, again, to instruct Krazy Kat to release the Moxie inventory being improperly held at Krazy Kat's facility.  Lakhani refused. Instead, Lakhani told Tulsee that, if she wished to move forward with featuring Moxie's products on GMA, she should: (a) sell the products on GMA before she obtained them from Krazy Kat; and (b) wire the customer payments to Krazy Kat in real time, after which Krazy Kat would release the subset of Moxie inventory purchased by GMA customers. Having no other option, Moxie attempted to move forward under that construct. Because of the quick three-day turnaround required under the GMA agreement, Moxie sent a truck to wait outside of Krazy Kat's warehouse that could be loaded in real time as customer orders were placed on GMA. Krazy Kat personnel, however, were not equipped to sort through the parcels of Moxie inventory in the warehouse to quickly identify the subset of individual products requested by GMA customers. Thus, when the truck returned to Moxie, it contained only a portion of the goods ordered by GMA customers. As a result, Moxie: (a) failed to fulfill a large number of the GMA orders; (b) had approximately ~1,000 upset

customers; (c) breached its agreement with GMA; and (d) lost out on the opportunity to feature Moxie and its products on future episodes of GMA and/or its sister shows.

52.     Moxie also had the opportunity to feature its products on the television series Viewpoint with Dennis Quaid. Viewpoint is a documentary series hosted by the actor Dennis Quaid that features certain causes and businesses. Viewpoint streams to 84,000,000 homes across the U.S. In addition to the exposure from appearing on the television episode, Viewpoint also provides featured businesses the opportunity to send targeted call-to-action marketing to its large email mailing list, which list included an estimated 1,000,000 scrub-wearing medical professionals. Moxie filmed the Viewpoint episode, but it never subsequently aired because Moxie did not have the inventory to sell to Viewpoint's audience. And because the episode never aired, Moxie also lost out on the opportunity to send call-to-action marketing to the approximately 1,000,000 scrub-wearing professionals on Viewpoint's mailing list.

53.     In September 2023, Moxie decided it had no other choice but to develop a new supply chain, terminate the MSA, and live with the inequitable outcome that Lakhani would move forward with his control over Moxie under the Note Agreements while Moxie received none of the bargained-for benefits of the MSA.

54.     On September 19, 2023, Moxie sent Krazy Kat a notice of termination that stated, among other things: "While our goal is to amicably part ways, it is crucial to acknowledge the ongoing breach of our original agreed-upon terms outlined in [the MSA] … We maintain the need for our remaining inventory in your possession."

55.     At the time Moxie terminated the MSA, Krazy Kat was in possession of approximately $545,000 MSRP in Moxie inventory, a material portion of which Moxie had fully paid for through the various pre-payment demands outlined above. Acting on the instructions of

Lakhani, Krazy Kat continued to refuse to release any portion of the inventory to Moxie.

56.    After terminating the MSA, Moxie attempted to construct an alternative supply chain through which it could gain access to the inventory it needed. Recognizing that third-party manufacturers were unlikely to provide Moxie inventory on the favorable net-90-day payment terms contained in the MSA, Moxie attempted to raise additional capital to help finance its going-forward inventory purchases.

57.    In October 2023, Moxie identified a new lead investor, who agreed to invest $800,000 in Moxie at a favorable valuation. Lakhani exercised his rights under the Note Agreements to block the investment. Moxie attempted to negotiate with Lakhani, but the delay caused by Lakhani's interference resulted in the new lead investor backing out of the deal.

58.    In December 2023, Lakhani was promoted to Chief Executive Officer of Careismatic. The Careismatic press release announcing Lakhani's promotion stated that Lakhani had "a proven track record of success" for Careismatic.

59.    Upon information and belief, Lakhani took the actions described above to harm Moxie for his own benefit, including to advance his career at Careismatic and to increase the value of his Careismatic equity.

60.    Lakhani's conduct caused Moxie significant damages, including but not limited to: (a) lost profits from e-commerce sales over a multi-year period; (b) lost profits from retail opportunities, including with Scrubs & Beyond and Scrubs on Wheels; (c) lost profits from product sales on GMA; (d) lost profits from the opportunity to feature Moxie and its products on GMA and its sister shows in the future; (e) lost profits from the opportunity to feature Moxie and its products on Viewpoint with Dennis Quaid and to send targeted call-to-action marketing to Viewpoint's large email mailing list; (f) lost value of paid-for inventory; (g) lost investments by

outside investors; (h) increased cost of capital due to Moxie's depressed sales and valuation; (i) significant out-of-pocket costs; and (j) a significant diminution in Moxie's overall enterprise value compared to what it would have been today but for Lakhani's conduct.

## CAUSES OF ACTION

### COUNT 1
### Breach Of Fiduciary Duty

61.    Moxie incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

62.    Lakhani owed fiduciary duties to Moxie for two independent reasons. First, he was a director of Moxie. Second, and independently, he had significant control over Moxie under the terms of the Note Agreements.

63.    Lakhani, however, had a significant conflict of interest—he was simultaneously (a) a director of Moxie with significant control over the company and (b) an employee of Moxie's largest competitor with a significant financial interest in the success of that entity.

64.    Lakhani breached his fiduciary duties to Moxie by acting in Careismatic's interest to Moxie's detriment. To advance his personal interests, Lakhani improperly directed Krazy Kat to deny Moxie access to inventory under the terms of the MSA. Shockingly, Lakhani disclosed this disloyal course of conduct to Moxie *at a Moxie board meeting that he was attending in his capacity as a Moxie board member.*

65.    Lakhani thereafter repeatedly took actions designed to benefit himself and Careismatic to Moxie's detriment, including: (a) directing Krazy Kat not to provide Moxie inventory under the terms of the MSA; (b) directing Krazy Kat to withhold inventory that Moxie had already paid for; (c) exercising his rights under the Note Agreements to block Moxie's ability to raise capital from additional outside investors; and (d) coercing Moxie to adhere to these

decisions by threatening to call Moxie's obligations under the Note Agreements.

66.    When Moxie explained the damage his actions were causing the company to Lakhani, and requested that Lakhani act in Moxie's best interests consistent with his fiduciary duties, Lakhani acknowledged his conflict of interest and openly stated he intended to act in the best interest of Careismatic (and, therefore, his own self-interest), and not Moxie.

67.    Lakhani's actions caused Moxie millions of dollars in damages, including those described in Paragraph 60 above.

**COUNT 2**
**Violation Of Massachusetts General Law Chapter 93A**

68.    Moxie incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

69.    Massachusetts General Law Chapter 93A prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

70.    Moxie and Lakhani were at all relevant times engaged in trade or commerce in the medical apparel market.

71.    Careismatic's internal documents describe that it had an internal plan to unfairly compete with new direct-to-consumer competitors by attacking them, interfering with their business, pressuring their bottom lines, drying up their access to funding, and, if possible, acquiring them on the cheap to help Careismatic compete in the emerging direct-to-consumer market.

72.    Consistent with this plan, and to advance his career at Careismatic and the value of his Careismatic equity, Lakhani impeded Moxie's access to inventory, pressured its bottom line, and attempted to acquired it on the cheap.

73.    Through this conduct, Lakhani ensured that Moxie would have little ability to compete with Careismatic, including little e-commerce sales, an inability to place products in

medical apparel retail stores, and an inability to take advantage of marketing opportunities, like the coveted ANA endorsement and appearances on television shows like GMA and Viewpoint.

74.     During the same time, Lakhani exercised his control rights under the Note Agreements to dry up Moxie's access to funding by blocking Moxie's ability to obtain additional outside investments.

75.     When Moxie attempted to push back on his conduct, Lakhani threatened to call Moxie's obligations under the Note Agreements—likely sending Moxie into bankruptcy—unless Moxie agreed to his various demands.

76.     This conduct was unfair and improper because it was tortious, unethical, oppressive, unscrupulous, and amounted to a form of commercial extortion, including because Lakhani used coercive tactics in an effort to extract undeserved concessions from Moxie.

77.     Lakhani's actions caused Moxie millions of dollars in damages, including those described in Paragraph 60 above.

78.     The center of gravity of the circumstances giving rise to this claim was Moxie's headquarters in Boston.

**COUNT 3**
**Tortious Interference With Advantageous Business Relations**

79.     Moxie incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

80.     Moxie had present or prospective business relationships with:

a.   Krazy Kat;

b.   retail sellers, including Scrubs & Beyond, Scrubs on Wheels, and GMA;

c.   marketing partners, including GMA, Viewpoint, and the ANA;

d.   e-commerce customers; and

     e.  third-party investors.

81.     Lakhani's conduct as described herein interfered with each of these relationships.

82.     Lakhani's interference with these relationships was intentional. Lakhani interfered with Moxie's business prospects for the purpose of advancing his career at Careismatic and increasing the value of his Careismatic equity. During the course of the conduct as described herein, Lakhani knew that:

     a.  Moxie was a Careismatic competitor;

     b.  Krazy Kat was obligated to provide inventory to Moxie under the terms of the MSA;

     c.  Moxie needed inventory to generate revenue and compete with Careismatic;

     d.  Moxie sold its products direct-to-consumers through its e-commerce platform and, without access to inventory, Moxie could not sell its products to e-commerce customers;

     e.  Moxie intended to sell its products retail medical apparel sellers and, without access to inventory, Moxie could not sell its products to retail partners;

     f.  Moxie had the ANA endorsement and agreements to promote its products on GMA and Viewpoint and, without access to inventory, Moxie could not capitalize on those opportunities;

     g.  Moxie was seeking to raise additional capital from third-party investors and, without revenue from product sales, and without Lakhani's consent under the Note Agreements, Moxie could not raise material capital from third-party investors and its funding would dry up.

83.     Lakhani's interference was improper because:

a. It was part of scheme to advance his career at Careismatic, and increase the value of his Careismatic equity, by impeding Moxie's ability to compete, drying up Moxie's access to funding, and creating a liquidity crisis at Moxie that would facilitate a "cheap" acquisition, accomplished through, among other things, coercive threats to call Moxie's obligations under the Note Agreements to extract concessions from Moxie under the MSA;

b. It was contrary to Krazy Kat's legal obligations under the terms of the MSA; and

c. It violated Massachusetts General Law Chapter 93A.

84.    Lakhani's actions caused Moxie millions of dollars in damages, including those described in Paragraph 60 above.

## COUNT 4
## Tortious Interference With Contract

85.    Moxie incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

86.    Moxie had contracts with the following third parties:

a. Krazy Kat;

b. the ANA;

c. GMA;

d. Viewpoint with Dennis Quaid; and

e. third-party investors.

87.    Lakhani's conduct as described herein interfered with each of these contracts.

88.    Lakhani's interference with these contracts was intentional. Lakhani interfered with Moxie's business prospects for the purpose of advancing his career at Careismatic and increasing

20

the value of his Careismatic equity. During the course of the conduct as described herein, Lakhani knew that:

a.  Moxie was a Careismatic competitor;

b.  Krazy Kat was obligated to provide inventory to Moxie under the terms of the MSA;

c.  Moxie needed inventory to generate revenue and compete with Careismatic;

d.  Moxie had marketing agreements with the ANA, and, without access to inventory, could not deliver product to the ANA's membership;

e.  Moxie had a sales agreement with GMA under which customer orders were required to be shipped within three days of the order placement and, without access to inventory, Moxie could not meet that obligation;

f.  Moxie had an agreement with Viewpoint, under which Viewpoint would feature Moxie in a television episode and promote Moxie's products through its email marketing list and, without access to inventory, Moxie could not air the episode;

g.  Moxie had agreements with third-party investors to make material investments in Moxie and, without Lakhani's consent under the Note Agreements, Moxie could not accept those investments.

89.  Lakhani's interference was improper because:

a.  It was part of scheme to advance his career at Careismatic, and increase the value of his Careismatic equity, by impeding Moxie's ability to compete, drying up Moxie's access to funding, and creating a liquidity crisis at Moxie that would facilitate a "cheap" acquisition, accomplished through, among other things,

coercive threats to call Moxie's obligations under the Note Agreements to extract concessions from Moxie under the MSA;

    b.   It was contrary to Krazy Kat's legal obligations under the terms of the MSA; and

    c.   It violated Massachusetts General Law Chapter 93A.

90.    Lakhani's actions caused Moxie millions of dollars in damages, including those described in Paragraph 60 above

## **PRAYER FOR RELIEF**

Moxie respectfully requests that the Court enter judgment in favor of Moxie and against Lakhani as follows:

A.    Determining that Lakhani breached his fiduciary duties to Moxie, violated Massachusetts General Law Chapter 93A, and tortiously interfered with Moxie's advantageous business relationships and contracts with third parties;

B.    Awarding money damages for all of the losses and injuries Moxie suffered as a result of the acts complained of herein in an amount to be determined at trial;

C.    Determining that Lakhani's conduct was willful or knowing and awarding double or treble damages under Massachusetts General Law Chapter 93A;

D.    Awarding costs, expenses and attorneys' fees incurred in this action;

E.    Awarding prejudgment interest;

F.    Awarding such other relief as may be just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated:  October 24, 2024

By their attorneys

*/s/ Raymond P. Ausrotas*

_____

Raymond P. Ausrotas (BBO No. 640315)
William F. McGonigle (BBO No. 569490)
**ARROWOOD LLP**
10 Post Office Square, 7th Floor South
Boston, MA 02109
Tel.: (617) 849-6200/Fax: (617) 849-6201
rausrotas@arrowoodllp.com
wmcgonigle@arrowoodllp.com


**DWOSKIN WASDIN LLP**
Nicholas F. Wasdin (*PHV forthcoming*)
DWOSKIN WASDIN LLP
110 N. Wacker Dr., Suite 2500
Chicago, IL 60606
Tel.: (312) 343-5361
nwasdin@dwowas.com

*Attorneys for Moxie Apparel, Inc.*