UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MOXIE APPAREL, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:24-cv-12711-IT |
| SIDHARTH LAKHANI, | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

May 19, 2025

TALWANI, D.J.

Pending before the court is Defendant Sidharth Lakhani's Motion to Dismiss [Doc. No. 13] Plaintiff Moxie Apparel, Inc.'s ("Moxie") Complaint [Doc. No. 1], which asserts tort claims and a claim under M.G.L. c. 93A based on allegations that Lakhani interfered with Moxie's ability to obtain inventory for its medical apparel business, enter into retail and promotional agreements with third parties, and raise capital through outside investment. Lakhani seeks dismissal of Moxie's claims based on a forum selection clause in a contract between Moxie and Krazy Kat Sportswear, LLC ("Krazy Kat"). For the reasons set forth below, Lakhani's Motion [Doc. No. 13] is DENIED.

I.  **Factual Background as Alleged in the Complaint**

Moxie is a medical apparel company that sells scrubs to medical professionals, including through a direct-to-consumer e-commerce platform. Compl. ¶ 12 [Doc. No. 1]. Moxie also had a marketing agreement with the American Nurses Association ("ANA"), which endorsed Moxie and marketed its brand in communications with members. Id. at ¶ 15. Krazy Kat is a company that manufactured and sold scrubs and contracted with Moxie to supply inventory. Id. at ¶¶ 2, 17.

Lakhani is the former owner and Chief Executive Officer of Krazy Kat. Id. at ¶¶ 2, 18. In late 2019, Lakhani and Moxie negotiated a dual investment and supply structure that resulted in various agreements: a Manufacturing and Supply Agreement ("MSA") between Moxie and Krazy Kat and several Note Agreements between Moxie and Lakhani, each of which was finalized and entered into in August 2020. Id. at ¶¶ 20–22.

Under the MSA, Krazy Kat agreed to design and manufacture 100% of Moxie's inventory requirements through at least August 2022 and provide the inventory to Moxie on net 90-day payment terms. Id. The MSA contained a forum selection clause, detailed below.

Under the Note Agreements between Lakhani and Moxie, Lakhani agreed to invest $300,000 in Moxie. Id. The Note Agreements provided Lakhani a seat on Moxie's board of directors, the right to approve material business decisions, and anti-dilution protection, which prevented Moxie from raising additional capital without Lakhani's consent. Id.

Several months after Krazy Kat entered into the MSA with Moxie, Careismatic Brands, LLC ("Careismatic"), a medical apparel manufacturer and a major Moxie competitor, acquired Krazy Kat from Lakhani. Id. at ¶¶ 3, 23–24. In connection with that transaction, Lakhani became a Careismatic employee and one of Careismatic's largest individual shareholders. Id. at ¶ 25. Thus, Lakhani was simultaneously a director of Moxie and an employee of Careismatic. Id. at ¶ 26.

After finalizing the MSA with Krazy Kat, Moxie requested that Krazy Kat manufacture and deliver a small, initial run of product so that Moxie could test market fit prior to placing a larger order. Id. at ¶ 29. Lakhani intervened and demanded that Moxie take an unusually large initial order of inventory. Id. at ¶ 30. Krazy Kat delivered the initial order to Moxie in March 2021 with payment due in June 2021. Id. at ¶ 31. Moxie struggled to move the large quantity of

inventory during the 90-day payment period. Id. at ¶ 32. Moxie paid half of the initial invoice on time, worked out a schedule with Krazy Kat to make weekly installment payments toward the balance, and ultimately paid the invoice in its entirety two months late. Id.

At a Moxie board meeting in October 2021, Lakhani informed Moxie's CEO that he would no longer direct Krazy Kat to honor the net-90-day payment terms in the MSA and instead would require Moxie to pre-pay 50% of any future invoice at the time the order was placed. Id. at ¶ 33. The change in payment terms caused a multi-month delay in Moxie's ability to place a second order. Id. at ¶ 36. Between October 2021 and March 2022, Moxie raised additional capital so that it could pay a 50% deposit on a new order. Id. at ¶ 36. Moxie eventually placed a second order in March 2022. Id.

After Moxie made the 50% deposit on its new order, Lakhani stated that Moxie would be required to pay the remaining 50% in full before Krazy Kat would deliver the goods. Id. at ¶ 39. Without access to this inventory, Moxie would not be able to generate enough revenue to pay the remaining balance prior to delivery. Id. Moxie's CEO explained this situation to Lakhani, and said that if Lakhani was going to block Krazy Kat from performing under the net-90-day terms in the MSA, the terms of the Note Agreements (including Lakhani's control over Moxie and equity conversion rights) would need to be revisited because Moxie agreed to those terms in exchange for the terms set forth in the MSA. Id. Moxie's CEO asked Lakhani to advocate for Moxie and not hurt its growth, and Lakhani responded that he had "a conflict of interest being a board member of Moxie and also an employee of [Careismatic]," and that he intended to "do the right thing for the main business." Id. at ¶ 40. Lakhani also threatened to call Moxie's obligations under the Note Agreements unless Moxie agreed to his demands. Id. at ¶ 41.

In October 2022, Moxie's new order arrived at Krazy Kat's warehouse. Id. at ¶ 45. Moxie did not have the capital to pay off the entire $300,000 balance prior to delivery, so it asked Krazy Kat to break the order into three tranches that could be purchased individually. Id. Citing the new payment terms that Lakhani had imposed, Krazy Kat personnel refused to break the shipment into tranches and demanded that Moxie pay the entire outstanding balance prior to delivery. Id. Krazy Kat continued to hold Moxie's inventory at Krazy Kat's warehouse. Id.

The change in payment terms and subsequent refusal to release inventory that had arrived resulted in Moxie having little inventory. Id. at ¶ 46. Moxie could not make money to purchase the inventory from Krazy Kat because it did not have products to sell. Id. at ¶ 47. Moxie also could not raise money to purchase the inventory through outside investment because Moxie's poor sales and revenue data made investors leery, and because Lakhani had the ability under the Note Agreements to block additional outside investment. Id.

Because Moxie had little inventory, the percentage of visitors to its website who went on to make a purchase plummeted. Id. at ¶ 48. The lack of inventory also killed Moxie's ability to close deals it had been negotiating with third party retail partners. Id. at ¶ 49. Further, Moxie was unable to deliver products requested by ANA members, which strained its relationship with ANA. Id. at ¶ 50. And because of Moxie's lack of revenue, Moxie was unable to continue paying ANA under the terms of the parties' marketing agreements, and ANA stopped endorsing Moxie. Id.

In June 2023, Moxie received an opportunity to have its products featured on an episode of the Good Morning America television show under an agreement that required Moxie to ship products sold on the episode within three days of customer orders. Id. at ¶ 51. Moxie asked Lakhani to instruct Krazy Kat to release the inventory held at its facility. Id. Lakhani told

Moxie's CEO that if she wished to move forward, she should sell the products on Good Morning America before obtaining them from Krazy Kat and wire customer payments to Krazy Kat in real time, after which Krazy Kat would release the subset of Moxie inventory purchased by Good Morning America customers. Id. Moxie attempted to move forward under this plan. Id. However, Krazy Kat only provided a portion of the products ordered by Good Morning America customers. Id. As a result, Moxie failed to fulfill a large number of the Good Morning America orders, breached its agreement with Good Morning America, and lost out on the opportunity to feature Moxie and its product on future episodes of Good Morning America and its sister shows. Id. Moxie also had the opportunity to feature its products on another television series, but its episode never aired because Moxie did not have inventory to sell to the audience. Id. at ¶ 52.

In September 2023, Moxie decided to develop a new supply chain, and sent a notice to Lakhani seeking to terminate the MSA. Id. at ¶¶ 53–54. After terminating the MSA, Moxie attempted to raise additional capital to help finance inventory purchases. Id. at ¶ 56. In October 2023, Moxie identified a new lead investor who agreed to invest $800,000 in Moxie, but Lakhani exercised his rights under the Note Agreements to block the investment. Id. at ¶ 57. Moxie attempted to negotiate with Lakhani, but the delay resulted in the new investor backing out of the deal. Id.

II. **The MSA and the Forum Selection Clause**

The MSA between Moxie and Krazy Kat contains the following forum selection clause:

> Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement must be exclusively brought against either of the Parties in the courts of the State of New Jersey.

MSA, Ex. A to Mem. ISO Mot. to Dismiss 12 [Doc. No. 14-1]. The MSA also states that "[n]o amendment, modification, or waiver of any provision hereof shall be binding unless manually

executed in a writing identified as an amendment, by both Parties, or in the case of a waiver, by the Party granting the waiver." Id.

### III.    Standard of Review

A motion to dismiss based on a forum selection clause is treated as a motion to dismiss for failure to state a claim for which relief can be granted. Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009). In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

When a complaint's factual allegations are expressly linked to and dependent on a document, and that document's authenticity is not challenged, "that document effectively merges into the pleadings and the . . . court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998).

### IV.    Discussion

A forum selection clause "represents the parties' agreement as to the most proper forum" to hear disputes. Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S. 49, 63 (2013) (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 31

6

(1988)). The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." Id. (quoting Stewart Org., Inc., 487 U.S. at 33 (Kennedy, J., concurring)). Lakhani argues that the forum selection clause in the MSA is mandatory and bars Moxie from suing Lakhani in this court. Mem. ISO Mot. to Dismiss 1–2 [Doc. No. 14]. As explained below, although the forum selection clause is mandatory as to the claims it covers, it does not cover the claims that Moxie asserts here.

      A.     *Whether the Forum Selection Clause is Mandatory*

"[T]he threshold question in interpreting a forum selection clause is whether the clause at issue is permissive or mandatory." Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 17 (1st Cir. 2009). Permissive forum selection clauses "authorize jurisdiction and venue in a designated forum, but do not prohibit litigation elsewhere." Id. In contrast, mandatory forum selection clauses make "jurisdiction and venue . . . appropriate exclusively in the designated forum." Id. (quoting 14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3803.1 (3d ed. 1998)). Whether a forum selection clause is permissive or mandatory depends on the specific language of the contract at issue. Id.

      The forum selection clause in the MSA states that covered actions "must be exclusively brought . . . in the courts of the State of New Jersey." MSA, Ex. A to Mem. ISO Mot. to Dismiss, 12 [Doc. No. 14-1]. This language is mandatory. The phrase "must be exclusively brought" expresses the Parties' intention to make the courts of New Jersey the exclusive forum for disputes within the scope of the forum selection clause. See Silva v. Encyclopedia Britannica Inc., 239 F.3d 385, 388–89 (1st Cir. 2001) (explaining "the word 'must' expresses the parties' intention" to make a chosen forum exclusive).

7

B.    *Whether the Claims Fall Within the Scope of the Forum Selection Clause*

"The next step in evaluating the applicability of a forum selection clause is ascertaining its scope." Claudio-De Leon v. Sistema Universitario Ana G. Mendez, 775 F.3d 41, 47 (1st Cir. 2014). Lakhani argues that the forum selection clause covers Moxie's claims because they effectively allege that Lakhani failed to adhere to the terms of the MSA. Mem. ISO Mot. to Dismiss 7 [Doc. No. 14].

"The applicability of a forum selection clause does not depend on the nature of the underlying action." Rivera, 575 F.3d at 19. Instead, the language of the forum selection clause determines whether the claims at issue fall within its scope. Id. Here, the forum selection clause covers actions "seeking to enforce any provision of, or based on any right arising out of" the MSA. MSA, Ex. A to Mem. ISO Mot. to Dismiss 12 [Doc. No. 14-1].

Moxie asserts claims against Lakhani for breach of fiduciary duty (Count 1), violation of Massachusetts's unfair business practices statute, M.G.L. c. 93A (Count 2), tortious interference with advantageous business relations (Count 3), and tortious interference with contract (Count 4). Compl. ¶¶ 61–90 [Doc. No. 1]. Moxie's claims against Lakhani are based on rights under the common law and accorded by statute, not rights under the contract between Moxie and Krazy Kat. Moxie's breach of fiduciary duty claim alleges that Lakhani owed Moxie a fiduciary duty because the Note Agreements made him a director and significant shareholder of Moxie. Id. at ¶¶ 22, 62. And Moxie's tortious interference claims allege that Lakhani interfered with present or prospective contracts and business relationships that Moxie had with third parties, including Krazy Kat, retailers, the ANA, customers, and third-party investors. Id. at ¶¶ 80–81, 86–87. Moxie's claim under M.G.L. c. 93A is also based on an allegation that Lakhani exercised his control rights under the Note Agreements to block Moxie's ability to obtain outside investments. Id. at ¶ 74.

To be sure, part of the conduct underlying Moxie's claims is that Lakhani, for his benefit and the benefit of Careismatic, improperly directed Krazy Kat to impose payment and delivery terms that deviated from those set forth in the MSA, which inhibited Moxie's ability to obtain inventory and hurt its business. Id. at ¶¶ 63–64. And Moxie further alleges that Lakhani directed Krazy Kat to withhold portions of inventory that Moxie had paid for in full, blocked Moxie's ability to raise capital from outside investors, and coerced Moxie to acquiescing in these decisions by threatening to call Moxie's obligations under the Note Agreements. Id. at ¶¶ 55, 63–65. But these allegations that Lakhani interfered with the MSA or caused Krazy Kat to breach the MSA (tortious interference) differ from a claim that Krazy Kat breached the MSA.

Lakhani asserts that "[c]laims are within the scope of a forum-selection clause where they 'would not have been actionable but for the parties entering into the contract,'" citing Boom-OS, LLC v. Dom N' Tom, Inc., 2023 WL 6378188, at *3 (D. Mass. Sept. 29, 2023). Mem. ISO Mot. to Dismiss 8 [Doc. No. 14]. The claims here did not arise because Lakhani entered into the MSA. Indeed, although Lakhani signed the MSA for Krazy Kat, he is not a party to the MSA. See MSA, Ex. A to Mem. ISO Mot. to Dismiss 14 [Doc. No. 14-1]. Instead, the claims here are based on actions that Lakhani allegedly took on his own behalf or on behalf of Careismatic, and while owing a fiduciary obligation to Moxie based on the Note Agreements.

Lakhani also relies on Somerville Auto Transport Service, Inc. v. Automotive Finance Corp., 691 F. Supp. 2d 267 (D. Mass. 2010) and Kebb Management, Inc. v. Home Depot U.S.A., Inc., 59 F. Supp. 3d 283 (D. Mass. 2014), but those cases addressed forum selection clauses that covered disputes "relating to" the agreements at issue. Somerville Auto Trans., 691 F. Supp. at 269; Kebb, 59 F. Supp. 3d at 285. And the phrase "relating to," which means "simply 'connected

9

by reason of an established or discoverable relation,'" is broader in scope than "arising out of." Huffington v. T.C. Grp., LLC, 637 F.3d 18, 22 (1st Cir. 2011).

In sum, because the forum selection clause does not cover Moxie's claims, those claims may proceed in this forum.

## V.     Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. No. 13] is DENIED.

IT IS SO ORDERED.

May 19, 2025                                  /s/Indira Talwani
                                              United States District Judge